# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Apple iCloud account: vi.ceja1526@icloud.com<br>("Subject Account") | )<br>)<br>)<br>)<br>)<br>)    Case No.  25mj6845 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____NORTHERN_____ District of _____CALIFORNIA_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

   ☑ evidence of a crime;

   ☐ contraband, fruits of crime, or other items illegally possessed;

   ☐ property designed for use, intended for use, or used in committing a crime;

   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 545 | Conspiracy and Smuggling/Transportation of Smuggled Goods |
| 18 U.S.C. § 1538, 1540 | Endangered Species Act |
| 16 U.S.C. § 3372, 3373 | Lacey Act |

The application is based on these facts:

See Attached Affidavit incorporated herein by reference.

   ☑ Continued on the attached sheet.

   ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Victoria Van Duzer*

*Applicant's  signature*

Victoria Van Duzer, Special Agent, USFWS

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date:  _____12/09/2025_____

*Michelle M. Pettit*

*Judge's signature*

City and state:  San Diego, California

Hon. Michelle M. Pettit

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**

**APPLICATION FOR SEARCH WARRANT**

I, Victoria Van Duzer, Special Agent, United States Fish and Wildlife Service ("USFWS"), being duly sworn, hereby state as follows:

A.    **INTRODUCTION**

1.    I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with an iCloud account connected to the following Apple ID:

        a.  vi.ceja1526@icloud.com, believed to be used by Jesse Agus Martinez ("**Subject Account**")

for items which constitute evidence, fruits, and instrumentalities of violations of federal criminal law relating to illegal trafficking in protected wildlife, specifically, violations of Title 18, United States Code, Section 545 (smuggling goods into the United States and importation contrary to law); Title 16, United States Code, Sections 1538(c), (d) and 1540(b) (knowingly engaging in trade or possessing specimens traded in violation of the provisions of the Convention on International Trade in Endangered Species, also known as the Endangered Species Act); and Title 16, United States Code, Sections 3372(a)(1) and 3373(d)(1)(B) (illegal trafficking in wildlife, known as the Lacey Act) (together, the **Subject Offenses**); as more fully described in Attachment B.

2.    For the reasons set forth below, I believe there is probable cause for the requested warrant for the **Subject Account**, the contents for which are stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Apple Park Way, Cupertino, California 95014. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in **Attachments A and B**, which are attached hereto incorporated herein.

**B.    TRAINING & EXPERIENCE**

3.    I am a Special Agent ("SA") with the Department of the Interior, United States Fish and Wildlife Service ("USFWS"), Office of Law Enforcement.    I am presently assigned to the San Diego, California, field office and have been so employed since January 2022.  In that capacity, I am responsible for investigating violations of, among other things, the Lacey Act, the Endangered Species Act, and smuggling statutes under Title 18 of the United States Code.  Prior to obtaining a position as an SA with the USFWS, I was employed as a Police Officer with the Maui County Police Department from 2016 to 2021. I was employed as a Park Ranger for the United States National Park Service from 2009 to 2016. I am a graduate of the Federal Law Enforcement Training Center, Criminal Investigator Training Program; the USFWS Special Agent Basic School; Land Management Training Program and Maui Police Department Academy. I have over 15 years of combined law enforcement experience. In that time, I have investigated complex natural resource crimes involving violations related to the interstate and international trafficking of natural resources.

4.    As a USFWS SA, I have conducted or been involved in multiple search warrants relating to the illegal commercialization of protected fish and wildlife, and violations of federal natural resource laws including but not limited to the Lacey Act.  I have read, studied, and received training on the laws enforced by the USFWS.

5.    The Convention on International Trade in Endangered Species of Wild Flora and Fauna ("CITES") was an international agreement among approximately 183 governments, including the United States and Mexico, to protect fish, wildlife, and plants that may become threatened with extinction. CITES established import and export restrictions to protect these species from overexploitation through international trade. Under CITES, species are protected according to a classification system known as "appendices." International trade in species listed in these appendices is monitored and regulated by permits and quotas. The permit restrictions apply to live and dead specimens and skins, parts, and products made in whole or in part from a listed species. The

2

Endangered Species Act prohibits any person subject to the jurisdiction of the United States from engaging in any trade or possessing any specimens contrary to the provisions of CITES. 16 U.S.C. §1538(c)(1).

6.      Wildlife and plant species listed in Appendix I of CITES are threatened with extinction. Those listed in Appendix II of CITES include species not presently threatened with extinction but may become so if their trade is not regulated. Appendix II species may be allowed in trade but are strictly regulated and monitored. To import an Appendix II species into the United States, the exporter must obtain a valid "foreign export permit" issued by the specimen's country of origin before importation. Appendix III of CITES includes wildlife and plant species listed by CITES member countries as requiring international trade controls to prevent unsustainable or illegal exploitation of the species. International trade in such species is allowed only when the appropriate permits or certificates are presented.

7.      Pursuant to the federal regulations implementing CITES, an official CITES document is required to accompany all wildlife imports or exports of a species listed on a CITES Appendix. For imports from Mexico of a species listed on Appendix II, a CITES export permit from Mexico is required. 50 C.F.R. §23.20(e). If an individual wishes to travel internationally with their personally-owned wildlife subject to CITES, they may be exempt from other CITES requirements if they acquire and present upon entry a CITES certificate of ownership for the wildlife from the CITES management authority where they reside. 50 C.F.R. §23.44. In order to obtain a CITES certificate of ownership, the owner must be able to demonstrate that the wildlife was obtained lawfully. Id.

8.      All wildlife imported into the United States must be declared to the USFWS. A true and complete declaration Form 3-177, Declaration for Importation or Exportation of Fish or Wildlife, which provides information such as the species, the quantity, the name and address of the recipient, and the intended use of the wildlife, must be filed at or before the time of importation. 16 U.S.C. § 1538(e); 50 C.F.R. § 14.61. Federal regulations also require that the USFWS clear all wildlife imported into the United States, and that the

3

importer or his agent make available the wildlife being imported to the officer and all required permits, licenses, or other documents. 50 C.F.R. § 14.52. The wildlife may only be cleared at certain ports authorized in the regulations, unless specifically authorized elsewhere. 50 C.F.R. § 14.11.

9.      The federal wildlife protection statute known as the Lacey Act is found at Title 16, United States Code, Section 3371 et seq. The Lacey Act makes it unlawful for any person to import, export, sell, receive, acquire, or purchase any fish or wildlife or plant taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States. 16 U.S.C. § 3372(a)(1).

10.     To obtain clearance for the import of wildlife, the exporter must provide to inspectors at the border, together with the wildlife, all shipping documents (including waybills, bills of lading, packing lists and invoices); all permits, licenses and documents required by the laws and regulations of the United States; and all permits or other documents required by any foreign country involved in the transaction. 50 C.F.R. §14.52.

11.     In addition, to import many types of wildlife, the wildlife must be subject to quarantine before it can be introduced into the United States. Many animals have diseases that can be transferred to humans (zoonotic diseases) or other animals that can have disastrous health effects to human or animal populations. For example, birds can carry and spread Avian influenza (bird flu), psittacosis, and histoplasmos. Bird flu is highly contagious and can cause flu like symptoms, respiratory illness, pneumonia and death in humans and other birds including birds raised in United States poultry farms. There are many other diseases that can be transmitted from different animals and have disastrous effects, that is why it is necessary to quarantine animals entering the United States to limit and safeguard against this potential disease transmission.

12.     Based on my experience and training, and conversations with others involved in enforcement of laws pertaining to fish and wildlife, I know that people involved in illegal trafficking in fish and wildlife frequently send photographs of the wildlife to others, to demonstrate the species, size and stature. Persons trafficking in fish and wildlife are also

known to send photographs, text messages and emails to others regarding prices, transportation and delivery arrangements, as well as records of financial transactions involving the wildlife products. Such persons also are known to conduct internet research and save documents regarding the legal requirements for the purchase, sale, transport, shipment, import, and export of wildlife and wildlife products.

13. Based on my training and experience, and conversations with other law enforcement agents, I know that dealers in exotic wildlife post images of their products on the internet and send images and messages via email, Facebook Messenger, WhatsApp, and other social media platforms to potential customers to facilitate sales, which are found on cell phones.

14. In particular, with respect to international sales, I know that business is conducted via electronic mail cell phone messaging platforms, including transmission of invoices and records of payment and shipping records, in order to facilitate the international transactions. I know that in other investigations I have seen shipping records, receipts, financial records, and documents sent via email, text messages and apps found on cell phones.

15. Based on my experience and training in working international wildlife trafficking investigations, I know that individuals must communicate well in advance with sellers, to coordinate the logistics, invoices, bills of lading, flights, and payments of international shipments, and for purchasers to make arrangements to meet with the seller to inspect the wildlife and determine if purchase is to proceed. For this reason, cell phones may contain relevant data for weeks or months before a smuggling event occurs.

***Scope of Search***

16. Based upon my training, experience, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location

5

data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Additionally, this same information is generally backed-up by Apple and maintained in the cloud [iCloud]. Specifically, searches of cellular telephones of individuals involved in the smuggling of regulated wildlife, and stored back-up data stored in Apple's cloud [iCloud] [the **Subject Account**] may yield evidence:

    a.    tending to indicate efforts to import, export, purchase, sell, transport and/or ship wildlife;

    b.    consisting of images of protected wildlife;

    c.    tending to indicate knowledge of the legal requirements for the purchase, sale, transport, shipment, import and export of protected wildlife;

    d.    tending to identify accounts, facilities, storage devices, or services such as email addresses, IP addresses, and phone numbers that contain evidence of efforts to illegally traffic in wildlife;

    e.    tending to identify co-conspirators, criminal associates, or others involved in illegal trafficking in wildlife;

    f.    tending to identify travel to or presence at locations where wildlife was purchased, sold, transported and/or delivered;

    g.    tending to identify the user of, or persons with control over or access to, the **Subject Account**; and/or

    h.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

17.    I am also familiar with Apple products and services and know, based on my training, experience, and conversations with other law enforcement officers.

18.    The facts and conclusions set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, my review of documents and records related to this investigation, communications with others who have personal knowledge of the events, details, and

circumstances described herein, and information gained through my training, experience, and communications with colleagues. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation. Dates and times are approximate.

**D.    FACTS IN SUPPORT OF P FACTS IN SUPPORT OF PROBABLE CAUSE**

19.    According to Customs and Border Protection (CBP) reports, on October 23, 2025, at approximately 12:50 pm, MARTINEZ, a 35-year-old U.S. Citizen residing in Mexico, entered the United States, on foot, from Mexico at the Otay Mesa Port of Entry. The primary inspection officer obtained two negative declarations from MARTINEZ. Upon checking CBP records, the primary inspection officer learned that MARTINEZ had previously smuggled birds into the United States in his groin area. MARTINEZ was referred to secondary inspection. While escorting MARTINEZ to secondary inspection, the primary inspection officer noticed that MARTINEZ's groin area seemed abnormally bulging. MARTINEZ claimed several times that the bulge was "pirrin," the Spanish word for penis.

20.    As the primary inspection officer escorted Martinez to the security office area, they passed under the pedestrian bridge.  MARTINEZ whistled loudly at someone, and someone else responded with a volley of whistles.  When asked who he was whistling to, MARTINEZ said it was his brother.  They continued to the security office for further processing.

21.    In the security office, CBP Officers conducted a pat down on MARTINEZ. At that time, MARTINEZ advised the officers that he had birds in his groin area.  The inspecting officer saw a brown material protruding from the waistline of MARTINEZ's underwear.  The officer located two brown sacks, each containing one orange-fronted parakeet, in MARTINEZ' underwear.  The sacks containing the orange-fronted parakeets are shown in the photos below.

7



*One of the captive birds in a sack as it was removed from MARTINEZ' underwear.*



*One of the captive birds as it was being removed from the sack.*

22.    A CBP Agricultural Specialist responded to the security office and removed the birds from the brown sacks. The birds were apparently unconscious, but breathing, and appeared heavily sedated, as shown in the photograph below. The birds were later identified by a USFWS Wildlife Inspector as juvenile orange-fronted parakeets.  Based on my training and experience, I know that orange-fronted parakeets (*Eupsittula canicularis*) are native to Mexico and are listed on Appendix II of CITES.  The birds were placed in a bird cage with food and water until they could be cared for by Veterinary Services.



*The parakeets shortly after being confiscated, showing signs of heavy sedation.*

23.    A Homeland Security Investigations Special Agent and I arrived to investigate. After being advised of his Miranda rights, MARTINEZ agreed to an interview. MARTINEZ stated that the birds were his pets, and he obtained them from his uncle in Mexico. It was MARTINEZ's intent to bring them into the United States and keep them in a shoe box in his van. MARTINEZ reported that he hid the birds in his pants because he didn't have a "bird certificate" to legally bring them into the United States. MARTINEZ denied sedating the birds but claimed he put them in socks to keep them quiet.

24.     MARTINEZ reported that approximately two months prior, he attempted to bring a bird into the United States but was caught by CBP and the bird was confiscated.

25.     No documentation or other paperwork related to the parakeets was located in in MARTINEZ' personal property. According to my review of government records, at the time of importation, MARTINEZ did not possess a license from USFWS to import wildlife or file a form 3-177. MARTINEZ did not possess a CITES export permit, certificate of origin, or other CITES documentation that would permit them to lawfully import the parrots.  Furthermore, the concealment of the birds would have resulted in their entering the United States without any quarantine period or process.

26.     According to CBP, a cellular telephone was located on MARTINEZ at the time he was detained. MARTINEZ used the cellular telephone to show CBP a photograph of his passport to gain entry into the United States.  The cellular telephone is a pink cellular iPhone. CBP officers provided me with the phone, and it is now in the custody of Fish and Wildlife Services.

27.     A search warrant for the cellular telephone was signed by Honorable Valerie E. Torres on October 24, 2025 (Case No. 25-MJ-5863-VET).  The cellular telephone was forensically downloaded on 10/31/2025, though the extraction provided limited usable information.  Review of the forensic download in Axiom shows the **Subject Account** as the single iCloud account discovered to be associated with the cellular telephone.  A preservation request was submitted to Apple for the Subject Account on or about December 1, 2025.

28.     Based upon my experience and training, as well as consultation with other law enforcement officers experienced in the smuggling of regulated wildlife, there is probable cause to believe that evidence of the Subject Offenses will be found in the **Subject Account**. Such evidence, which could be in the form of emails, text messages, other social messaging applications, photographs, audio files, videos, location records, or other data backed up to the **Subject Account**, is relevant to proving smuggling, and/or the illegal importation of regulated wildlife.

29.    I know from my training and experience that regulated wildlife smuggling, like drug smuggling, generally entails detailed and intricate planning as part of efforts to evade detection by law enforcement.  This requires planning and coordination in the days, weeks, or months prior to the relevant smuggling-related event.  Additionally, I am aware that possible co-conspirators are often unaware of a subject's apprehension and will continue to attempt to communicate with the subject after the subject is stopped at a port of entry to determine the whereabouts of their valuable cargo, particularly in the hours following the arrest.  Therefore, I believe that the appropriate date range for the search of the cellular telephone is from October 9, 2025, up to and including October 24, 2025.

## C.    BACKGROUND CONCERNING APPLE[1]

30.    Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

31.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

a.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and iCloud.com.

b.    iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

---

[1] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

c.     iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via iCloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d.     Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e.     Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

f.     Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g.     App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television

shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

32.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address [often ending in @iCloud.com, @me.com, or @mac.com] or an email address associated with a third-party email provider [such as Gmail, Yahoo, or Hotmail]. The Apple ID can be used to access most Apple services [including iCloud, iMessage, and FaceTime] only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

33.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

34.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's

website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

35.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through iCloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

36.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings,

Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

37.    In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

38.    For example, the stored communications and files connected to an Apple ID may provide direct evidence of the subject offenses. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the subject offenses.

39.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows Investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

40.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

41.    Further, I know when a user has an Apple Watch with cellular and an activated cellular plan, the user can stay connected even when away from their iPhone. For all other models of Apple Watch, there are still things the user can do even when the user is away from their iPhone and not connected to Wi-Fi.[2]  When the iPhone is off or out of range, the Apple Watch can use a Wi-Fi network to send and receive data. The watch can also connect to a cellular network if it's a cellular model. If a user set up an Apple Watch for a family member, they can use a cellular or Wi-Fi connection with their watch. A Wi-Fi or cellular connection lets the Apple Watch do the following things, even if your iPhone isn't with you.[3]

42.    Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators [e.g. encrypted communication platforms]. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

---

[2] The information was found on website: https://support.apple.com/guide/watch/useapple-watch-without-its-paired-iphone-apd0443fb403/watchos. According to Apple "Apple Watch has a built-in GPS that allows you to get more accurate distance and speed information during an outdoor workout without your paired iPhone. Apple Watch Series 3, Apple Watch Series 4, and Apple Watch Series 5 also have a built-in barometric altimeter to get more accurate elevation gain/descent information. The always-on altimeter in Apple Watch SE, Apple Watch Series 6, and Apple Watch Series 7 is even more accurate, showing your current elevation in real time."

[3]    The    referenced    information    can    be    found    on    website: https://support.apple.com/enus/HT205547.

16

43.    I know, based on my training, experience, discussions with other law enforcement officers, and background information related to Apple provided here, that an Apple ID is required to access and use the above captioned features on an Apple product. I know Defendant's cellular telephone was an Apple product because it appeared to be a pink Apple iPhone and was associated with an iCloud email address. Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

### *Temporal Scope of the Requested Search*

44.    I know, based on my training and experience, including my experience within this case, that controlled substance trafficking often involves continuing communication that transpires over the days, weeks, and months prior to a distribution event. That activity often continues throughout the life of the overall conspiracy, which is an ongoing series of events, that can often last for months or years.

45.    Finally, given the facts of this affidavit, my understanding of how Apple accounts can be used in furtherance of the offenses as described herein, and my awareness that Apple accounts can retain information for extended periods of time, I submit that this Court should authorize a search of the **Subject Account** for the period starting on October 9, 2025 [two weeks prior to Defendant's apprehension], up to and including October 24, 2025 [the day of Defendant's apprehension].

### E.    INFORMATION TO BE SEARCHED AND ITEMS TO BE SEIZED

46.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, Investigators or other federal agents and personnel will need to

process the data into a format that may be reviewed. Investigators will then need to review the data to locate the items described in Section II of Attachment B. This process takes time. The personnel conducting the examinations into responsive data will **complete the analysis within 90 days** of the date the data is received from Apple, absent further application to this court.

**F.    CONCLUSION**

47.    Based on all of the facts and circumstances described above, there is probable cause to conclude that the **Subject Account** contains evidence of violations of the subject offenses and will contain electronic evidence of those violations, as more fully described in Attachment B.

48.    **WHEREFORE**, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to seize and search the items described in Attachment **A**, and the seizure of items listed in the corresponding Attachment B.

*Victoria Van Duzer*
_____
Victoria Van Duzer
Special Agent
U.S. Fish and Wildlife Service, Office of
Law Enforcement

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on December 9, 2025.

_____
HON. MICHELLE M. PETTIT
United States Magistrate Judge

18

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with Apple ID, vi.ceja1526@icloud.com ("**Subject Account**") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Service of Warrant**

The officer executing the warrant shall permit Apple Inc., as the custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**II.      Information to be disclosed by Apple Inc. ("Apple")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, Apple is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ( "MIN"), Subscriber Identity Modules ("SIM"), Mobile

Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.      The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.      The contents of all instant messages associated with the account, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.      The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.      All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all

2

Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps to include date and time stamps;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

**III.    Information to be Seized by the Government**

All information described above in Section II that constitutes evidence of violations of Title 18, United States Code, Section 545 (smuggling goods into the United States and importation contrary to law); Title 16, United States Code, Sections 1538(c), (d) and 1540(b) (knowingly engaging in trade or possessing specimens traded in violation of the provisions of the Convention on International Trade in Endangered Species, also known as the Endangered Species Act); and Title 16, United States Code, Sections 3372(a)(1) and 3373(d)(1)(B) (illegal trafficking in wildlife, known as the Lacey Act) (together, the **Subject Offenses**); limited to the period of **October 9, 2025** up to and including **October 24, 2025**, and to the seizure of evidence:

a.      tending to indicate efforts to import, export, purchase, sell, transport and/or ship wildlife;

b.      consisting of images of protected wildlife;

3

c.   tending to indicate knowledge of the legal requirements for the purchase, sale, transport, shipment, import and export of protected wildlife;

d.   tending to identify accounts, facilities, storage devices, or services such as email addresses, IP addresses, and phone numbers that contain evidence of efforts to illegally traffic in wildlife;

e.   tending to identify co-conspirators, criminal associates, or others involved in illegal trafficking in wildlife;

f.   tending to identify travel to or presence at locations where wildlife was purchased, sold, transported and/or delivered;

g.   tending to identify the user of, or persons with control over or access to, the **Subject Account**; and/or

h.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

All of the above constituting evidence of a violation of the subject offenses.

4